IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No.  37415-7-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| OLIVER JAMES HARMON, | ) | |
| | ) | |
| Appellant. | ) | |

STAAB, J. — Oliver Harmon appeals from convictions on four counts of rape of a child in the second degree and one count of communication with a minor for an immoral purpose.  He assigns numerous errors to the trial proceedings, including instructional error and prosecutorial misconduct.  We agree that Harmon was denied his constitutional right to a unanimous verdict on the communication with a minor count, but find no other reversible error.  We reverse his conviction on that count and remand for resentencing and retrial.

FACTS

This prosecution arises from the alleged sexual abuse by Oliver Harmon of the preteen daughter of his childhood friend, Richard.  The facts are drawn from the trial record.

Richard describes Harmon as having been a family friend since Richard was around 10 years old. In summer 2016, Richard's then-12-year-old daughter, whom we refer to pseudonymously as Tammy ("Richard" is also a pseudonym), began visiting and staying overnight with Harmon and his girlfriend, Katrina Earhart. Harmon had known Tammy since she was a baby. Harmon was then 43 years old.

Tammy believes it was "like the first night [she] stayed over" at the Harmon/Earhart home that she confessed to Harmon that she "had feelings for him." Report of Proceedings (RP) at 279-80. According to Tammy, he told her "the feelings was [sic] mutual, that he liked me too and stuff," and then tickled her. RP at 280. She believes that is the first time she kissed him.

When Tammy visited Harmon and Earhart, she would sleep with them in their queen-size bed. According to Earhart, Tammy would sleep on Harmon's side of the bed or in the middle between the two, and Harmon occasionally slept naked or in his underwear. According to Tammy, it was Harmon who slept in the middle, and slept nude. Earhart "didn't think it was weird at all" that Harmon would sleep naked when Tammy was in the bed. RP at 119. According to Earhart, anyone who knows Harmon "knows that he sleeps naked, he walks around the house, you know, in his underwear." RP at 119.

During Tammy's visits to the Harmon/Earhart home, the trio passed the time playing cards, playing hide-and-seek, and wrestling. Harmon and Earhart lived in a

mobile home that was located in a storage lot, and the hiding occurred in and around

vehicles that the couple's landlord stored at the lot. Among the vehicles were portable

offices, a dump truck, trailers, an excavator, mobile homes, pilot trucks, and one white

and one purple semitruck.

According to Tammy, between July and December 2016, when she was 12 and 13

years old, she and Harmon engaged in at least 10 sexual acts. The acts occurred in the

mobile home's master bedroom, its spare bedroom, on the living room couch, in or on

portable offices, and in the purple and white semitrucks. Tammy engaged in these acts

with Harmon because she thought she loved him.

Tammy identified no dates on which the sexual acts occurred, but she testified at

trial to details that distinguished one encounter from another. She testified that during

games of hide-and-seek with Earhart, Harmon digitally penetrated her vagina two or

three times while the two sat on a bed covered in plastic, inside the white semitruck.

According to Tammy, she and Harmon entered the cab of the truck by opening unlocked

doors. On one occasion inside the semitruck, according to Tammy, Harmon told her that

her vagina was tight and that she needed to finger herself. Tammy testified that Harmon

also touched her breasts four or five times inside the white semitruck during the hide-and-

seek games.

Tammy asserted that she and Harmon also engaged in vaginal intercourse. During

one instance in a spare room, he unsuccessfully attempted to insert his penis into her

vagina.  Tammy suffered pain and bled from the incident.  Once while Earhart bathed,

Tammy and Harmon had vaginal intercourse with Harmon wearing a condom.  On

another occasion, the two engaged in intercourse while Harmon wore an orange, magnum

condom.

According to Tammy, on four or five occasions, Harmon performed oral sex on

her on the bed in the white semitruck and in his bedroom.  On two or three occasions,

Tammy masturbated Harmon.  The latter activity occurred once inside the white

semitruck.  On another occasion, Tammy masturbated Harmon on top of a portable

office.

Tammy claims that Earhart knew she and Harmon had "kissed and stuff" because

Tammy and Harmon told her about it.  RP at 320.  Tammy claims they did not tell

Earhart about "the sex part" because "it would just break her."  RP at 320, 340.

According to Tammy, Earhart cried when told about the kissing and stuff.  Because

Harmon had told Tammy he wanted to engage in a threesome with the two women,

Tammy then kissed Earhart.  Tammy backed off when Earhart responded by putting her

tongue in Tammy's mouth, however, because Tammy dislikes French kissing.

Tammy's sexual activity with Harmon came to the attention of responsible adults

in 2017, after Richard's girlfriend, Paula,[1] overheard Harmon speaking to Tammy on

---

[1] A pseudonym.

Skype, a video chat application, in December 2016. The conversation sounded flirtatious. A couple of months later, Tammy told Paula more about her and Harmon's relationship. Paula told Tammy she needed to tell her father, and Paula then reported what she had learned to police.

Following the report to law enforcement, Union Gap Police Detective Shawn James went to the storage lot where the Harmon/Earhart mobile home was located and took photographs. He wished to photograph the inside of the white semitruck, where Tammy alleged one of the rapes occurred, but found that its doors were locked.

Harmon was charged with four counts of rape of a child in the second degree and one count of communication with a minor for immoral purposes. For each rape count, the State alleged the aggravating factor of an ongoing pattern of sexual abuse. Each of the four rape counts alleged the crime took place between June 1, 2016, and December 31, 2016.

The charges proceeded to a five-day jury trial. Among the State's witnesses was Tammy's paternal grandmother, Natalie Forenpohar. Forenpohar testified to Harmon's long relationship with the family. She also testified that she did not feel comfortable with Tammy staying overnight with Harmon and Earhart, given that Tammy was only 12, and Forenpohar's unexplained concern about the couple's "lifestyle." RP at 163.

In cross-examining Forenpohar, defense counsel raised an issue not touched on during direct: Forenpohar's observations to investigating officers that Tammy's behavior

5

changed around the time the sexual relationship allegedly began. The following

exchange occurred between defense counsel and Forenpohar:

>Q [By defense counsel] . . . Now, do you recall discussing the matters that are the subject of this trial with Detective James of the police department?
>
>A Yes.
>
>Q Okay. And do you recall discussing with him how your granddaughter [Tammy] had changed over this matter?
>
>A Yes.
>
>Q Okay. *And do you recall telling Detective James that* [*Tammy*] *used to listen to you but would not now, she would not lie to you or hide things from you, but now after this incident she had started lying and hiding things and would not talk to you?*
>
>A *Yes.*
>
>. . . .
>
>Q Okay. Well, when kids hit that age, don't they start doing that sort of thing with their parents or grandparents and change their behavior and—
>
>A They might, but do they start cutting?
>
>Q Don't know, do they? But it's not unusual for kids to stop talking with their parents or not talking quite so much with their parents or grandparents and not sharing everything with them and *sometimes they even start lying. Is that correct?*
>
>A *It might be*, but [Tammy] always talked to me. She never had any reason not to.

RP at 166-67 (emphasis added).

In the defense case, Harmon admitted that Tammy kissed him and confessed her

love for him but he denied having any sexual contact with her. He described his

relationship with Tammy as an uncle-niece relationship.  Earhart similarly denied that

Harmon or Tammy shared a sexual relationship.

Harmon and Earhart's landlord testified (as did Harmon and Earhart) that the

semitrucks on his property were kept locked and that only he and his wife had access to

the keys.  He explained that he kept the semitrucks locked because of the sleeper cab bed

in each, out of concern that otherwise homeless people would sleep in the cabs.  He

averred that he never observed signs of forced entry into either semitruck.

Among the trial court's jury instructions were a few dealing with the fact that

multiple criminal acts were charged.  They included instruction 3, a "unanimity"

instruction, which informed jurors that for each rape count, they "must unanimously

agree as to which act has been proved."  Clerk's Papers (CP) at 25.  They included

instruction 6, a "separate crime" instruction, which informed jurors that a separate crime

was charged in each count and each must be decided separately.  CP at 28.

Neither party proposed a unanimity instruction for the communication with a

minor count, nor did the court give such an instruction for that count.  Neither party

objected to any jury instruction.

The trial court used the same elements instruction for all four rape counts,

distinguished only by the identification of the count at issue.  Consistent with the

charging document, each elements instruction stated that one element that must be proved

7

was that Harmon had sexual intercourse with Tammy "on, about, during or between June 1, 2016 and December 31, 2016." CP at 32-35.

During closing arguments, when the prosecutor spoke to jurors about the communication with a minor count, she identified several acts that could support the conviction. She told jurors, "You as a jury need to find one." RP at 482.

In thereafter discussing the rape counts, the prosecutor talked to jurors about how to analyze the multiple counts of rape, and how different acts could be different counts.

When it was defense counsel's turn to close, he reminded the jurors of grandmother Forenpohar's testimony that Tammy exhibited changed, deceptive behavior at ages 12 and 13. Challenging Tammy's credibility, he argued in part,

> Ms. Earhart and Mr. Harmon deny that anything occurred between him and [Tammy]. Furthermore, [Tammy]'s own allegations themselves don't stand up to scrutiny. She can't remember the details regarding this situation. *Her own grandmother says she's—she was lying.*

RP at 519 (emphasis added).

The prosecutor responded to this attack on Tammy's truthfulness with the following argument in rebuttal:

> Now, I think there was some mischaracterization of Natalie[ Forenpohar]'s testimony. When Mr. Oakley gets up and says, well Natalie got on the stand and she said her granddaughter lied. So therefore, she's completely not credible and you can't believe a thing out of [Tammy]'s mouth. That is not what Natalie said. *Natalie fully believes everything out of [Tammy]'s mouth in regard to what happened to her in what Oliver did. That's why she testified. That's what she was talking about.*

So. *And you know what, it's not for myself or for Mr. Oakley to tell you who's lying, who's not lying, what it is.* Let's look at Instruction Number 1. Instruction Number 1, I think Mr. Oakley read you the first paragraph, somewhere down in the second one that talks about the things that you can consider in regard to witness testimony. And it talks about the opportunity for the witness to observe and know the things he or she is testifying about. The ability of the witness to observe accurately the quality of a witness's memory loss testifying. The manner of while they're testifying. Any personal interests of what the witness might have in the outcome of the issues. Any personal, any bias, or prejudice the witness may have shown. So, it's up for you to determine where we are. And what has been proven to you. That's your job. That's why we picked you. For you guys to evaluate all the evidence, all the witnesses, go back into that jury room and together collectively make a decision on that.

RP at 524-25 (emphasis added). Defense counsel did not object.

The jury found Harmon guilty as charged. It also answered yes to four special verdict forms for the aggravating factor of an ongoing pattern of sexual abuse, indicating that each rape was "part of an ongoing pattern of sexual abuse of the same victim . . . manifested by multiple incidents." CP at 53-56.

The trial court imposed a standard range sentence. Its judgment and sentence states in part that "[w]hile on community custody, the defendant shall . . . [p]ay supervision fees as determined by [the Department of Corrections]," notwithstanding that Harmon was found indigent for purposes of appointment of counsel on appeal. CP at 60, 71. Harmon appeals.

9

LAW AND ANALYSIS

We analyze Oliver Harmon's brief on appeal as raising five issues, which we address in turn.

I.    THE TRIAL COURT DID NOT ERR BY FAILING TO PROVIDE AN UNREQUESTED "SEPARATE AND DISTINCT ACTS" INSTRUCTION ON COUNTS 1 THROUGH 4 (ASSIGNMENTS OF ERROR 1 THROUGH 3)

Oliver Harmon contends that his four rape convictions violated his constitutional right to be free from double jeopardy.  Because the State used identical language to charge him with multiple rapes and did not allege specific dates for each, Harmon argues that the trial court should have instructed the jury that each of his four rape convictions must be based on distinct acts.  He asks us to vacate three of the four rape convictions and remand the remaining conviction for resentencing.

The State responds that the invited error doctrine bars Harmon's double jeopardy claim because he requested the pattern *Petrich*[2] instruction, whose note on use states that it should be used "when the evidence indicates that several distinct criminal acts have been committed, but the defendant is *charged with only one count* of criminal conduct." 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 4.25 note on use at 124 (5th ed. 2021) (WPIC) (emphasis added).  It also argues that even if Harmon did not invite error, he does not face double jeopardy because it is manifestly

---

[2] *State v. Petrich*, 101 Wn.2d 566, 569, 683 P.2d 173 (1984), *abrogated on other grounds by State v. Kitchen*, 110 Wn.2d 403, 756 P.2d 105 (1988).

apparent from the record that the State did not seek to impose multiple punishments for the same offense.

*Invited error*

The invited error doctrine prevents a party from creating an error at trial and then relying on that error for a challenge on appeal. *In re Pers. Restraint of Coggin*, 182 Wn.2d 115, 119, 340 P.3d 810 (2014). The doctrine bars a criminal defendant's challenge even when the alleged error involves constitutional rights. *State v. Peters*, 10 Wn. App. 2d 574, 582, 455 P.3d 141 (2019). In determining whether the invited error doctrine applies, courts have "considered whether a defendant affirmatively assented to the error, materially contributed to it, or benefitted from it." *State v. Momah*, 167 Wn.2d 140, 154, 217 P.3d 321 (2009). The defendant must materially contribute to the error by engaging in some type of affirmative action through which he knowingly and voluntarily sets up the error. *In re Pers. Restraint of Call*, 144 Wn.2d 315, 328, 28 P.3d 709 (2001); *State v. Wakefield*, 130 Wn.2d 464, 475, 925 P.2d 183 (1996); *State v. Mercado*, 181 Wn. App. 624, 630, 326 P.3d 154 (2014). The State bears the burden of proof that an error is invited. *State v. Thomas*, 150 Wn.2d 821, 844, 83 P.3d 970 (2004).

Harmon contends that double jeopardy was created by the elements instructions, instructions 10 through 13, because they failed to require separate and distinct acts for each crime. Since the giving of Harmon's requested *Petrich* instruction did not set up the error about which he complains, the invited error doctrine does not apply.

*"Manifestly apparent" analysis*

The state and federal constitutions double jeopardy clauses prohibit multiple punishments for the same offense. U.S. CONST. amend. V, XIV; CONST. art. I, § 9; *State v. Turner*, 169 Wn.2d 448, 454, 238 P.3d 461 (2010). The protections against double jeopardy can be violated when a defendant is charged with identically-described counts of a single crime and the jury instructions allow the jury to base convictions for multiple counts on a single underlying event. *State v. Borsheim*, 140 Wn. App. 357, 366, 165 P.3d 417 (2007). The problem is not prevented by the giving of unanimity and separate crime instructions, because jurors might unanimously agree that a single criminal act was committed, understand that each count alleges a separate crime, and yet not understand (because not instructed) that each crime must be based on a different act.

Harmon never complained at trial that the jury instructions created a risk that he would be punished more than once for the same rape, but a defendant may raise a double jeopardy claim for the first time on appeal. RAP 2.5(a)(3); *State v. Mutch*, 171 Wn.2d 646, 661, 254 P.3d 803 (2011).

*Borsheim* and other decisions of this court have long held that in multiple act/*multiple count* cases, trial courts should protect against double jeopardy by instructing the jury "'that they are to find separate and distinct acts for each count.'" 140 Wn. App. at 367 (internal quotation marks omitted) (quoting *State v. Hayes*, 81 Wn. App. 425, 431, 914 P.2d 788 (1996)). While such defendants have sometimes sought to rely on the

WPIC 4.25 *Petrich* instruction, it "reflects the single-count roots of *Petrich*,"[3] as our

Supreme Court observed in *State v. Carson*, 184 Wn.2d 207, 217, 357 P.3d 1064 (2015).

In a multiple act/multiple count prosecution it does not ensure against double jeopardy.

This court has never held that the giving of a "separate and distinct acts"

instruction is essential to avoid double jeopardy in a multiple act/multiple count case.  A

claim of double jeopardy can be rejected if other facts establish that the jury instructions

"[made] the relevant legal standard manifestly apparent to the average juror."  *Borsheim*,

140 Wn. App. at 366 (internal quotation marks omitted) (quoting *State v. Watkins*, 136

Wn. App. 240, 241, 148 P.3d 1112 (2006)); *State v. Weaver*, 198 Wn.2d 459, 466, 496

P.3d 1183 (2021).  *Borsheim* observed that in *State v. Ellis*, 71 Wn. App. 400, 859 P.2d

632 (1993), for example, the trial court safeguarded against double jeopardy by giving

separate "to convict" instructions for each count[4] and by stating in those instructions that

---

[3] In *State v. Carson*, the majority opinion tended to attach the label of "*Petrich* instruction" to *only* an instruction like WPIC 4.25, given in a multiple act/single count case.  184 Wn.2d 207, 216-17, 224, 357 P.3d 1064 (2015).  A concurring opinion observed that the note on use to WPIC 4.25 at that time stated that the instruction could be modified for multiple act/multiple count cases, citing *Hayes* and *Borsheim* as examples.  The concurrence referred to such a multicount instruction as a *Petrich* instruction.  *Id.* at 231-33 (Gordon-McCloud, J., concurring).  We take a cue from *Borsheim*, referring to an instruction designed to ensure unanimity as a "unanimity instruction" and an instruction designed to avoid double jeopardy as a "separate and distinct act" instruction.

[4] In *Borsheim*, a single "to convict" instruction was given for all four identical counts of first degree rape of a child, "further compound[ing]" the double jeopardy concern in that case.  140 Wn. App. at 368.

13

the underlying criminal act had to have occurred at a different time than acts underlying other counts. *Borsheim*, 140 Wn. App. at 368-69 (citing *Ellis*, 71 Wn. App. at 401-02). Such instructions made it apparent that the trial court "was attempting to draw the jury's attention to the principle that each count charged the commission of a separate event." *Id.* at 369.

It was definitively established that "a separate and distinct act" instruction is *not* essential in *Mutch*, 171 Wn.2d at 663 (internal quotation marks omitted). The court held that "flawed jury instructions that permit a jury to convict a defendant of multiple counts based on a single act do not necessarily mean that the defendant received multiple punishments for the same offense; it simply means that the defendant *potentially* received multiple punishments for the same offense." *Id.* The court also disapproved of cases in which this court failed to look beyond jury instructions in reviewing a double jeopardy challenge. *Id.* at 663-64 (disapproving of *State v. Berg*, 147 Wn. App. 923, 931, 198 P.3d 529 (2008); *State v. Carter*, 156 Wn. App. 561, 234 P.3d 275 (2010)).

*Mutch* teaches that appellate courts reviewing allegations of double jeopardy "'may review the entire record to establish what was before the court.'" *Id.* at 664 (quoting *State v. Noltie*, 116 Wn.2d 831, 848, 809 P.2d 190 (1991)). If it is not clear from "the evidence, arguments, and instructions" that it was *manifestly apparent* to the jury that the State was not seeking to impose multiple punishments for the same offense and that each count was based on a separate act, there is a double jeopardy violation. *Id.*

*Mutch* also held that the outcome of rigorous "manifestly apparent" review should be the same as constitutional harmless error analysis. *Id.* at 664-65 & n.6 (emphasis omitted) (quoting *Berg*, 147 Wn. App. at 931).

We turn to a review of the relevant evidence, arguments, and instructions in the trial below.

*Evidence*

The State's direct examination of Tammy elicited her testimony to at least 8 acts that would constitute second degree rape of a child—in closing argument, the prosecutor represented that her testimony had established anywhere between 8 and 11 acts of penile-vaginal penetration, other vaginal penetration, or oral-genital sexual contact. RP at 499. While Tammy did not remember dates, the questioning sought details that would distinguish separate acts: the type of sexual act and how often it occurred, and details such as what had been occurring before it happened, where it took place, things that were said, and how long it lasted. *E.g.*, RP at 283-306, 311-16.

The State's lengthy questioning about the details of separate acts suggested to jurors that the State was not asking them to impose multiple punishments for a single offense.

*Argument*

The principal issue at trial, and therefore the focus of the parties' arguments, was whether *any* sexual contact (anything more than a kiss) took place at all. For that reason,

15

and because no concern was raised below that jurors might return more than one guilty verdict for a single rape, the lawyers did not disagree in their closing arguments about how to decide the four rape counts. The prosecutor offered an explanation, however.

The prosecutor directed the jurors' attention to instruction 3, which told them that "[t]o convict the defendant on any count of rape of a child in the second degree, one particular act of rape of a child in the second degree must be proved beyond a reasonable doubt, and you must unanimously agree as to which act has been proved." CP at 25. The prosecutor told the jurors:

> Okay. So, Instruction Number 3 that the Judge read to you is really kind of deformed, convoluted thing because *the State is alleging four counts* of rape of a child in the second degree and all four of those Counts are for that six month time period. So, this Jury Instruction outlines how you guys can go back and figure out okay, so [Tammy] said that there was this time that he put it in raw and it made her bleed. *Okay, that can one count* [sic].
> Okay, there's another time where [Tammy] said he—sorry, where [Tammy] said that he put his right—put his finger in me where my baby— where a baby would came out of. *That could be another count. So, you need to figure out if there's collectively four counts of sexual intercourse that fit that definition.*
> Now, the State would believe that based off of [Tammy]'s testimony, where she talks about 2 maybe 3 times of actual sexual intercourse with penile vaginal penetration. Then there's 4 or 5 times of genital penetration. And there's 2 to 3 times of the eating her out. So, you need to collectively go back as a jury and figure this Instruction out.

RP at 499-500 (emphasis added).

Speaking to jurors about the special verdict form, the prosecutor told them,

16

> [N]ot only do you have to determine *if there is four counts of rape of a child 2* and one count of communicating with a minor for immoral purposes, but you have to go a step further and *you have to decide if this is an ongoing pattern of sexual behavior.*
>     And so, the Judge has gone through jury—the Special Verdict Forms and so this is the Jury Instruction that's going to walk you through that. *So, are there multiple incidents?* So, you'll need to assess all the evidence, all the testimony and determine that.

RP at 500 (emphasis added).

These explanations served the same purpose as a "separate and distinct acts" instruction. Harmon fails to persuade us that the prosecutor's argument did not make it apparent that the State was not asking jurors to impose multiple punishments for a single offense.

*Instructions*

In *Ellis*, Judge Dean Morgan, writing for the panel, observed, "[I]t is our view that the ordinary juror would understand that when two counts charge similar crimes, each count requires proof of a different act." 71 Wn. App. at 406. *Ellis* has been abrogated by *Mutch*, which requires more. But we need not discard the common sense inference that while the giving of unanimity, separate crime, and separate elements instructions will not *guarantee* against double jeopardy, the fact that jurors were given all three makes it more likely they will understand that each count requires proof of a different act.

Harmon's jury not only received unanimity, separate crime, and separate elements instructions, it was instructed on the aggravating circumstance of an ongoing pattern of

17

sexual abuse. The question posed by each of four special verdict forms, to which the

jurors answered yes, was

> Was the crime part of an ongoing *pattern of sexual abuse* of the same
> victim under the age of 18 years manifested by *multiple incidents* over a
> prolonged period of time?

CP at 53-56 (emphasis added).

It is manifestly apparent from (1) the State's presentation of lengthy detailed

evidence of multiple acts, (2) its explanation in closing argument of the need to agree to

one act of rape for one rape count and another act for another, and (3) the giving of the

unanimity, separate crime, separate elements, and special verdict instructions, that the

State was not asking jurors to impose multiple punishments for a single offense. Double

jeopardy is not shown.

II.    JURY UNANIMITY - COMMUNICATION WITH A MINOR (ASSIGNMENTS OF ERROR 4
       THROUGH 6)

The State also presented evidence of multiple acts that would constitute its single

charge of communication with a minor for an improper purpose. In closing, the

prosecutor identified multiple acts that could support conviction for that count and told

the jury it must decide on which act to find him guilty.[5] Unlike the rape counts, the jury

---

[5] As to this count, the prosecutor argued:

So, no matter what you decide is that communicating with a minor for
immoral purposes, was it the phone call, was it the video chat, was it the
conversation that [Paula] overheard where she thought that [Tammy] was
talking to a boyfriend that she was giddy and flirty? Was it the video chat

18

was not given a unanimity instruction for the communication with a minor count.

Harmon contends that for those reasons, and because the State failed to elect one act as

the basis for the charge, he was denied his Sixth and Fourteenth Amendment to the

United States Constitution right to a unanimous verdict.

The State's response once again relies on the invited error doctrine, arguing that

by proposing a unanimity instruction for the four counts of second degree child rape but

not for the communication with a minor charge, Harmon assisted in creating the error.

*Invited error*

What constitutes invited error has already been discussed. Recall that for error to

be invited, the defendant must materially and voluntarily contribute to the error appealed.

*Mercado*, 181 Wn. App. at 630. The fact that Harmon did not propose a unanimity

instruction for the communication with a minor count is an act of omission, not an

affirmative act. The invited error doctrine does not apply.

---

> that [Tammy] told us about yesterday, where Oliver asked her to come over
> and she came over and then there was the orange condom incident? Or the
> Judge read to you Instructions that it could be words or conduct. So, is it
> Oliver opening that semi door to get her into the back on that plastic
> mattress? *You get to decide*.

and,

> [Tammy] gave you a lot of examples of this. *You as a jury need to find
> one*.

RP at 481-82 (emphasis added).

19

*Failure to instruct or elect*

The federal and state constitutions guarantee a criminal defendant the right to a unanimous verdict. U.S. CONST. amend. VI, XIV; CONST. art. I, § 21; *Ramos v. Louisiana*, 140 S. Ct. 1390, 1397, 206 L. Ed. 2d 583 (2020); *State v. Armstrong*, 188 Wn.2d 333, 340, 394 P.3d 373 (2017); *Petrich*, 101 Wn.2d at 569. The State implicates this right when it argues and presents evidence of many distinct acts that could constitute a crime, but has charged only one count without identifying it by a distinct time and place. Jurors could each find that the evidence proved that a crime was committed by some act, but without agreeing that the same act was proved to be a crime beyond a reasonable doubt. *State v. Kitchen*, 110 Wn.2d 403, 411, 756 P.2d 105 (1988).

To ensure unanimity in multiple act/single count cases, the State must either elect the act on which it relies for conviction or the court must instruct the jury that all 12 jurors must agree that the State proved the same criminal act beyond a reasonable doubt. *State v. Camarillo*, 115 Wn.2d 60, 64, 794 P.2d 850 (1990); *Petrich*, 101 Wn.2d at 572.

The State did neither here, and in the case of this count, the prosecutor's argument did not prevent the problem. The prosecutor argued to jurors that they needed to "decide" or "find" one act that would support the communication with a minor count, but she did not tell them they had to agree on the *same* act as supporting the count. This presents a classic violation of the right to a unanimous jury verdict and requires reversal of this conviction and a new trial.

20

III.  WHETHER THE PROSECUTING ATTORNEY COMMITTED PREJUDICIAL MISCONDUCT IN VOUCHING FOR THE VICTIM AND ARGUING FACTS NOT IN EVIDENCE (ASSIGNMENTS OF ERROR 7 THROUGH 9)

Harmon asserts that the prosecutor committed misconduct in closing arguments by improperly vouching for Tammy's grandmother, and arguing facts not in evidence. Harmon acknowledges that he did not object to the challenged statement. "'In order to establish prosecutorial misconduct, a defendant must show that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial.'" *State v. Slater*, 197 Wn.2d 660, 681, 486 P.3d 873 (2021) (internal quotation marks omitted) (quoting *State v. Magers*, 164 Wn.2d 174, 191, 189 P.3d 126 (2008)). A defendant's failure to object essentially raises the bar. When a defendant fails to object, we will reverse for prosecutorial misconduct during closing only if "the remark is so flagrant and ill intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury." *State v. Russell*, 125 Wn.2d 24, 86, 882 P.2d 747 (1994). "In other words, a conviction must be reversed only if there is a substantial likelihood that the alleged prosecutorial misconduct affected the verdict." *Id.*

Harmon challenges one sentence in the prosecutor's closing argument. To put this sentence in context, we consider the testimony at trial. Tammy's grandmother testified that Tammy's behavior changed after she began associating with Harmon. Specifically, Tammy's grandmother testified that before her relationship with Harmon, Tammy was

honest and open with her grandmother, but after the relationship began, Tammy began

lying and hiding things from her grandmother. During closing, defense counsel

challenged Tammy's credibility, arguing that "[s]he can't remember the details regarding

this situation. Her own grandmother says she's—she was lying." RP at 519. In rebuttal,

the State responded to this argument:

> Now, I think there was some mischaracterization of
> [grandmother]'s testimony. When [defense counsel] gets up and says,
> well [grandmother] got on the stand and she said her granddaughter lied.
> So therefore, she's completely not credible and you can't believe a thing
> out of [Tammy]'s mouth. That is not what [grandmother] said.
> [*Grandmother*] *fully believes everything out of* [*Tammy*]*'s mouth in
> regard to what happened to her in what Oliver did. That's why she
> testified. That's what she was talking about*.

RP at 524 (emphasis added). Defense counsel did not object or request a mistrial.

On appeal, Harmon contends that the comment constitutes misconduct not only

because it referenced facts outside the record, but because it indirectly vouched for

Tammy's credibility. It is misconduct for a prosecutor to suggest that the jury decide a

case based on evidence outside the record. *State v. Pierce*, 169 Wn. App. 533, 553, 280

P.3d 1158 (2012). A prosecutor also commits misconduct by improperly vouching for a

witness. *State v. Ish*, 170 Wn.2d 189, 196, 241 P.3d 389 (2010). A prosecutor

improperly vouches when indicating that "evidence not presented at trial supports the

witness's testimony." *Id*. The prejudicial effect of the prosecutor's comments are

reviewed in the context of the State's total argument. *State v. McKenzie*, 157 Wn.2d 44,

22

52, 134 P.3d 221 (2006). Prosecutors may argue inferences from the evidence, but prejudicial error will be found if "it is 'clear and unmistakable' that counsel is expressing a personal opinion." *State v. Brett*, 126 Wn.2d 136, 175, 892 P.2d 29 (1995).

In this case, it is clear that the prosecutor's comment referenced evidence outside the record. The grandmother never testified that she believed Tammy's allegations. Nor did the grandmother express her reasons for testifying. It is less clear that the prosecutor's comment constitutes vouching by the prosecutor. While the prosecutor referenced facts outside the evidence, it is not clear and unmistakable that the prosecutor was expressing the prosecutor's personal opinion.

While the prosecutor's reference to evidence outside the record was misconduct, this does not automatically require reversal. Under the heightened standard, a defendant who fails to object to perceived misconduct at trial must show more than impropriety and prejudice to succeed on appeal. *State v. Loughbom*, 196 Wn.2d 64, 74, 470 P.3d 499 (2020). Instead, when a defendant fails to object to an improper comment at trial, the defendant must show that the prejudice was incurable. *Id*. Incurable prejudice has only been found "'in a narrow set of cases where we were concerned about the jury drawing improper inferences from the evidence.'" *Id*. (quoting *In re Pers. Restraint of Phelps*, 190 Wn.2d 155, 170, 410 P.3d 1142 (2018)). The Supreme Court has recognized reversible misconduct under this heightened standard when the misconduct is either so

inflammatory that it threatens the fundamental fairness of trial, or when it is so severe as to demonstrate that it was flagrant and ill intentioned. *See Phelps*, 190 Wn.2d at 171.

Harmon argues that the prosecutor's misconduct in this case was flagrant because it is well established that prosecutors may not provide a personal opinion, vouch for a witness, or allude to facts outside the record. The dissent agrees and relies on the decision in *State v. Fleming*, 83 Wn. App. 209, 213, 921 P.2d 1076 (1996). In *Fleming*, the court found misconduct when the prosecutor argued that to acquit the defendant, the jury must find that the State's witnesses are either lying or mistaken. *Id*. at 213. The Court of Appeals deemed this misconduct flagrant because the same argument had been rejected in a published decision a year and a half earlier. *Id*. at 214.

While the court in *Fleming* reversed a conviction based on its finding that the misconduct was flagrant, the Supreme Court requires more than a violation of known standards. It requires intentional misconduct that is so pervasive that it cannot be cured. In *In re Personal Restraint of Glassmann*, the prosecutor's closing argument relied extensively on a slide show presentation that superimposed captions on top of photographic evidence. 175 Wn.2d 696, 286 P.3d 673 (2012). The captions included phrases like "GUILTY," and "DO YOU BELIEVE HIM?" *Id.* at 706. The court found that adding captions to the photographs amounted to unadmitted evidence. The court also recognized that prior case law established that it "is improper to present evidence that has been deliberately altered in order to influence the jury's deliberations." *Id*. Because

24

these standards were well known when the prosecutor in *Glasmann* intentionally presented altered photographs during closing argument, the court found the prosecutor's misconduct to be flagrant and ill intentioned. *Id*. at 707.

In addition to finding the misconduct flagrant, the court went on to find that the "misconduct here was so pervasive that it could not have been cured by an instruction." *Id*. The court recognized that "'[T]he cumulative effect of repetitive prejudicial prosecutorial misconduct may be so flagrant that no instruction or series of instructions can erase their combined prejudicial effect.'" *Id*. (quoting *State v. Walker*, 164 Wn. App. 724, 737, 265 P.3d 191 (2011)).

In other cases, the Supreme Court has made it clear that our review of unchallenged prosecutorial misconduct should focus less on whether the misconduct was flagrant and more on whether it was curable by an objection. In *State v. Emery*, 174 Wn.2d 741, 278 P.3d 653 (2012), the prosecutor made two erroneous arguments. First, that in order to acquit, the jury must be able to say, "I doubt the defendant is guilty, and my reason is blank." *Id*. at 750-51. Second, the prosecutor argued that the "truth of these charges" is that the defendant was guilty and then charged the jury with "speak[ing] the truth" by holding the defendants accountable. *Id*. at 751. The Supreme Court agreed that both arguments were improper and then took the opportunity to clarify the standard of review when a defendant fails to object to prosecutorial misconduct. *Id*. at 761.

25

The court noted that objections are necessary to correct the error, prevent it from reoccurring, and to prevent abuse of the appellate process. Conversely, "An objection is unnecessary in cases of incurable prejudice only because 'there is, in effect, a mistrial and a new trial is the only and the mandatory remedy.'" *Id*. at 762 (quoting *State v. Case*, 49 Wn.2d 66, 74, 298 P.2d 500 (1956)). *Emery* tells us that our focus on review is less about whether the misconduct was flagrant and more on whether it was incurable. *Id*; *see also State v. Walker*, 182 Wn.2d 463, 478, 341 P.3d 976 (2015) (*Walker* II) ("We do not focus on the prosecutor's subjective intent in committing misconduct, but instead on whether the defendant received a fair trial in light of the prejudice caused by the violation of existing prosecutorial standards and whether that prejudice could have been cured with a timely objection.").

Likewise, in *In re Personal Restraint of Phelps*, 190 Wn.2d at 171, the court found misconduct, but not incurable misconduct. In *Phelps*, the prosecutor argued facts not in evidence during closing by making comments about the defendant "grooming" the victim. The defendant claimed that this error was flagrant and ill intentioned sufficient to overcome a lack of objection. The Supreme Court disagreed:

> Here, even assuming the prosecutor had committed misconduct, the misconduct did not cross the line into areas of conduct that would have threatened the fundamental fairness of his trial. The grooming comments did not rise to the level of being inflammatory, nor did they come close to the level of severity our precedent suggests is necessary to meet the 'flagrant and ill intentioned' standard.

26

*Id*.

The narrow set of cases where the Supreme Court has found incurable misconduct generally include the use of inflammatory comments or repeated, pervasive, and intentional misconduct. *See Loughbom*, 196 Wn.2d at 75 (prosecutor's repeated remarks about curing the "war on drugs" during opening and closing was flagrant and ill intentioned); *State v. Monday*, 171 Wn.2d 667, 676, 257 P.3d 551 (2011) (prosecutor injected racial prejudice into the trial by arguing "black folk don't testify against black folk"); *Slater*, 197 Wn.2d at 683 (prosecutor was allowed to argue throughout closing that one missed court date was evidence of guilt); *Glasmann*, 175 Wn.2d at 707 (prosecutor's extensive use of slide show with captions superimposed over photographs was improper, and misconduct was so pervasive that it could not be cured by instruction); *Walker* II, 182 Wn.2d at 471-72 (of the 250 slides used in prosecutor's closing, a significant number contained derogatory comments and personal opinions of guilt).

In this case, after a five-day trial, the prosecutor uttered one sentence in rebuttal that was improper. Although the comment was in response to Harmon's closing, which also mischaracterized the evidence, the prosecutor went too far in referencing evidence outside the record and claiming that one witness was vouching for another. The prosecutor's immediate shift to the jury instructions suggests that the comment was inadvertent as opposed to intentional. Regardless, the comment was not inflammatory, not repetitive, and not pervasive. Nor was it incurable.

27

The trial court could have cured any prejudice resulting from the State's remarks by reminding the jury that the arguments of counsel are not evidence and reminding them to disregard arguments that are not supported by the record. The court could have also reminded the jury that they are the sole judges of the credibility of the witnesses. These instructions are standard for a reason. To say that they would not cure the very error that they are directed toward is to say that they are ineffective as instructions.

IV. WHETHER TRIAL COUNSEL PERFORMED INEFFECTIVELY BY FAILING TO OBJECT TO THE PROSECUTORIAL MISCONDUCT (ASSIGNMENTS OF ERROR 10 AND 11)

In the alternative, Harmon argues that his attorney was constitutionally ineffective for failing to object to the prosecutor's comment during closing. The standard for ineffective assistance of counsel is well established. Criminal defendants have a constitutionally guaranteed right to effective assistance of counsel. U.S. CONST. amend. VI; CONST. art. I, § 22; *State v. Lopez*, 190 Wn.2d 104, 115, 410 P.3d 1117 (2018). A claim of ineffective assistance of counsel is an issue of constitutional magnitude that may be considered for the first time on appeal. *State v. Nichols*, 161 Wn.2d 1, 9, 162 P.3d 1122 (2007). Claims of ineffective assistance of counsel are reviewed de novo. *State v. White*, 80 Wn. App. 406, 410, 907 P.2d 310 (1995).

A defendant bears the burden of showing (1) that his counsel's performance fell below an objective standard of reasonableness based on consideration of all the circumstances and, if so, (2) there is a reasonable probability that but for counsel's poor

performance the outcome of the proceedings would have been different. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). If either element is not satisfied, the inquiry ends. *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009).

In reviewing the record for deficiencies, there is a strong presumption that counsel's performance was reasonable. *McFarland*, 127 Wn.2d at 335. The burden is on a defendant alleging ineffective assistance of counsel to show deficient representation. *Id*. The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances. *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986). When counsel's conduct can be characterized as legitimate trial strategy or tactics, performance is not deficient. *Kyllo*, 166 Wn.2d at 863.

A defendant must affirmatively prove prejudice, not simply show that "the errors had some conceivable effect on the outcome." *Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). A defendant demonstrates prejudice by demonstrating that the result of the proceeding would have been different but for counsel's deficient representation. *McFarland*, 127 Wn.2d at 337.

In this case, Harmon cannot establish deficiency or prejudice. If Harmon had objected to the prosecutor's comment in closing, there is a strong likelihood that the objection would have been sustained. As noted above, it is also likely that the trial court would have repeated instructions to the jury on evidence and judging credibility.

Nevertheless, lawyers frequently make a tactical decision not to object during closing unless an argument is assessed to be repeated or flagrant. Here, the prosecutor was responding to Harmon's argument, the comment was fleeting, and the prosecutor immediately turned to the jury instructions on evidence and credibility. There are legitimate, tactical reasons a defense attorney may not object to this comment.

Even if Harmon was able to show that counsel's failure to object was deficient and not the product of a tactical decision, he fails to show that a timely objection would have changed the outcome of the trial. Instead, an objection would most likely have resulted in the trial court admonishing the jury that counsel's arguments are not evidence and they should disregard any arguments that are not supported by the evidence. The court may have also instructed the jury that they are the sole judges of the credibility of the witness. Both of these instructions were already provided to the jury and jurors are presumed to follow the instructions. *Phelps*, 190 Wn.2d at 172.

Finally, we note that Tammy's grandmother was not a primary or significant witness at trial. The primary witness was Tammy, and while her credibility was crucial, her grandmother's only relevant testimony was that Tammy's behavior changed after she developed a relationship with Harmon. In closing, both parties stretched inferences from the grandmother's testimony. Defense counsel argued, without objection, that even Tammy's grandmother believed the witness was lying about the allegations. This is not a case where the prosecutor's improper comments shifted the burden of proof, or relied on

No. 37415-7-III
*State v. Harmon*

inflammatory language, or was so intentional and so pervasive as to infect the trial. Because Harmon cannot show prejudice, he cannot meet his burden of showing ineffective assistance of counsel.

V.  WHETHER THE TRIAL COURT ERRED BY IMPOSING DEPARTMENT OF CORRECTIONS SUPERVISION COSTS

In its judgment and sentence, the trial court required Oliver Harmon to pay Washington Department of Corrections supervision fees. In a supplemental brief, Harmon argues that because he is indigent this was error. Since we are reversing one of his convictions and remanding, Harmon can raise this challenge to any imposition of the fees when he is resentenced.

We reverse Harmon's communication with a minor for improper purposes conviction, otherwise affirm, and remand for resentencing and any retrial.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Staab, J.

I CONCUR:


_____
Siddoway, A.C.J.

31

No. 37415-7-III
*State v. Harmon (concurring in part, dissenting in part)*

No. 37415-7-III

FEARING, J. (concurring in part and dissenting in part) — I concur in the majority's ruling that reverses Oliver Harmon's one conviction for communication with a minor for immoral purposes. I disagree with the majority's analysis and ruling with regard to prosecutorial misconduct and the omission of a distinct acts jury instruction. Based on the lack of this jury instruction, I would reverse all but one of Harmon's convictions for rape of a child in the second degree and dismiss the other three counts with prejudice. I would also reverse the one remaining rape of a child conviction because of prosecutorial misconduct and remand that charge for a new trial.

I do not include a statement of facts or of procedure because the majority above averagely outlines those facts and procedure. I employ the same pseudonyms as the majority.

Prosecutorial Misconduct

Oliver Harmon argues that the prosecutor committed flagrant, ill-intentioned, and prejudicial misconduct when declaring, during summation, that Tammy's grandmother believed Tammy's allegations against Harmon. Harmon asserts two grounds of misconduct that uniquely arise from the same remark. First, the prosecuting attorney's comments indirectly and unlawfully vouched for the credibility of Tammy. Second, the

State's attorney's improperly argued facts not in evidence. I address each ground

separately.

*Improper Vouching*

During cross-examination of Tammy's grandmother, Natalie Forenpohar, defense

counsel prompted Forenpohar to testify that, after the incidents with Oliver Harmon,

Tammy lied to and hid matters from the grandmother. In turn, defense counsel, during

closing, emphasized the lying of Tammy. Counsel probably suggested to the jury that

Forenpohar testified that Tammy lied about the conduct of Oliver Harmon, when counsel

remarked:

> She can't remember the details regarding this situation. *Her own grandmother says she's—she was lying.*

Report of Proceedings (RP) at 519 (emphasis added). In rebuttal, the State's attorney

remarked:

> Now, I think there was some mischaracterization of Natalie's [Forenpohar's] testimony. When Mr. Oakley [defense counsel] gets up and says, well Natalie got on the stand and she said her granddaughter lied. . . . That is not what Natalie said. *Natalie fully believes everything out of [Tammy's] mouth in regard to what happened to her in what Oliver did. That's why she testified. That's what she was talking about.*
> So. *And you know what, it's not for myself or for Mr. Oakley to tell you who's lying, who's not lying, what it is*.

RP at 524 (emphasis added).

On appeal, Oliver Harmon contends the State's attorney's rebuttal constituted

impermissible vouching for the veracity of the victim, Tammy, and thereby comprised

2

prosecutorial misconduct. The State responds that Harmon waived his prosecutorial

misconduct claim by failing to object to the challenged remarks during trial. I agree with

the majority that Harmon did not invite the error by failing to object.

The State also contends that any misconduct did not constitute flagrant and ill-

intentioned conduct requiring a reversal. The State highlights that defense counsel,

during closing, commented that Tammy's grandmother testified that Tammy was lying.

Nevertheless, the State does not contend that Harmon opened the door to any vouching

because of the questioning of Natalie Forenpohar or the defense's closing statement.

To resolve a claim of prosecutorial misconduct, I first inquire whether the

prosecutor made inopportune comments. Because I conclude that the prosecuting

attorney uttered improper comments, I later address whether the remarks were

inflammatory and ill-intentioned and thus reversible.

I address the law of vouching for another's veracity before returning to the subject

of prosecutorial misconduct. No reliable test for truthfulness exists, such that a witness is

not qualified to judge the truthfulness of a child's story. *United States v. Azure*, 801 F.2d

336, 341 (8th Cir. 1986); *State v. Dunn*, 125 Wn. App. 582, 594, 105 P.3d 1022 (2005).

This rule particularizes the general rule that no witness may give an opinion on another

witness' credibility. *State v. Neidigh*, 78 Wn. App. 71, 76-77, 895 P.2d 423 (1995); *State

v. Wright*, 76 Wn. App. 811, 821-22, 888 P.2d 1214 (1995); *State v. Suarez-Bravo*, 72

Wn. App. 359, 366, 864 P.2d 426 (1994); *State v. Padilla*, 69 Wn. App. 295, 299, 846

3

P.2d 564 (1993); *State v. Walden*, 69 Wn. App. 183, 186-87, 847 P.2d 956 (1993); *State v. Smith*, 67 Wn. App. 838, 846, 841 P.2d 76 (1992); *State v. Stover*, 67 Wn. App. 228, 231, 834 P.2d 671 (1992); *State v. Casteneda-Perez*, 61 Wn. App. 354, 362, 810 P.2d 74 (1991). Lay opinion of the truthfulness of another is not helpful within the meaning of ER 701, because the jury can assess credibility as well or better than the lay witness. *State v. Carlson*, 80 Wn. App. 116, 123, 906 P.2d 999 (1995).

In most sexual abuse cases, the respective credibility of the victim and the defendant looms crucial because the testimony of each directly conflicts and the two are the only percipient witnesses. *State v. Alexander*, 64 Wn. App. 147, 154, 822 P.2d 1250 (1992); *State v. Fitzgerald*, 39 Wn. App. 652, 657, 694 P.2d 1117 (1985). Therefore, a witness' declaring the victim to be telling the truth in essence marks the defendant with guilt. Opinions on guilt are improper whether made directly or inferentially. *State v. Quaale*, 182 Wn.2d 191, 199, 340 P.3d 213 (2014); *State v. Montgomery*, 163 Wn.2d 577, 594, 183 P.3d 267 (2008).

Lay witness testimony about the victim's credibility implicates the accused's guilt or innocence and thus implicates the accused's right to a fair trial and impartial jury under article I, section 21 of the Washington State Constitution and the Sixth Amendment to the United States Constitution. *State v. Johnson*, 152 Wn. App. 924, 934, 219 P.3d 958 (2009). The admission of testimony vouching for a witness forms constitutional error because such evidence violates the defendant's constitutional right to a jury trial,

4

which includes the independent determination of the facts by the jury. *State v. Quaale*, 182 Wn.2d at 199 (2014); *State v. Kirkman*, 159 Wn.2d 918, 927, 155 P.3d 125 (2007); *State v. Florczak*, 76 Wn. App. 55, 74, 882 P.2d 199 (1994). Vouching endangers the accused because jurors may surrender their own common sense in weighing testimony.

In addition to the law precluding the prosecuting attorney from asking a witness to vouch for the credibility of a witness, rules of professional responsibility and trial practice prohibit the State's attorney from vouching for a witness. *State v. Reed*, 102 Wn.2d 140, 146, 684 P.2d 699 (1984). Improper vouching generally occurs (1) if the prosecutor expresses his or her personal belief as to the veracity of the witness or (2) if the prosecutor indicates that evidence not presented at trial supports the witness' testimony. *State v. Ish*, 170 Wn.2d 189, 196, 241 P.3d 389 (2010) (plurality opinion).

The testimony of Natalie Forenpohar does not fit perfectly in the definition of a layperson "vouching." Forenpohar never testified that she believed Tammy's accusations against Oliver Harmon. But Forenpohar impliedly vouched for Tammy when she testified that Tammy only started lying after the assaults by Harmon. More importantly, the State told the jury that Natalie Forenpohar vouched for every utterance from the mouth of Tammy.

The prosecuting attorney did not express a personal belief as to the veracity of Tammy. Nevertheless, the prosecutor referred to evidence outside the record when

indirectly vouching for Tammy. The State's attorney claimed, contrary to the record, that the grandmother: "fully believes everything out of [Tammy's] mouth in regard to what happened to her and what Oliver did. That's why she testified." RP at 524.

Five Washington decisions, all involving alleged sexual abuse of a minor, entail reversals of convictions because of vouching for the credibility of a witness. In *State v. Sutherby*, 138 Wn. App. 609, 158 P.3d 91 (2007), *aff'd on other grounds*, 165 Wn.2d 870, 204 P.3d 916 (2009), a jury convicted Randy Sutherby of child rape and child molestation, among other charges. This court reversed because the trial court allowed the victim's mother to testify that her daughter was telling the truth. The mother stated she could determine if her daughter lied because of a half-smile that appeared on the child's face on prevarication. The mother impliedly suggested to the jury to judge the daughter's truthfulness, when the daughter testified before the jury, by her facial expression.

In *State v. Alexander*, 64 Wn. App. 147, 822 P.2d 1250 (1992), the prosecution questioned the victim's counselor, David Bennett, about whether the victim gave any indication that she was lying about the abuse. Bennett testified he did not believe the victim lied. This court reversed the conviction of Robert Alexander for child rape. Without analysis, this court also concluded that the error, combined with other error, was not harmless beyond a reasonable doubt.

Another important decision is *State v. Dunn*, 125 Wn. App. 582 (2005). This court reversed another conviction for rape of a child on the ground of inadmissible

testimony. Physician Assistant James Kramer testified that, despite an absence of any physical evidence of rape, he concluded that sexual abuse occurred because of the detailed story told him by the victim. The impermissible testimony was prejudicial because the only evidence of sexual abuse was the child's own testimony and hearsay statements to others. The evidence was sufficient to convict Larry Dunn of rape, but still not harmless because the trial pitted the child's credibility against Dunn's credibility.

In *State v. Jerrels*, 83 Wn. App. 503, 925 P.2d 209 (1996), the jury found Harvey Jerrels guilty of multiple child sex offenses involving his daughter and stepdaughters. At trial, the prosecutor asked the mother thrice as to whether she believed her children told the truth. The mother responded affirmatively each time. This court reversed Jerrels' conviction. We noted that a jury will not easily disregard a mother's opinion as to her children's veracity even if instructed to do so. The same may be true with regard to a grandmother's opinion.

A final compelling decision is *State v. Johnson*, 152 Wn. App. 924 (2009). The State charged Gerald Johnson with child molestation. The jury heard testimony that Johnson's wife believed the story of the victim. The court held the testimony to be reversible and manifest constitutional error.

I recognize that trial defense counsel speciously told the jury that Natalie Forenpohar testified that Tammy lied when accusing Oliver Harmon of rape and other misconduct. Defense counsel thereby deprecated the veracity of Tammy or essentially

7

unnvouched for her. The State's attorney, however, should not have responded by falsely proclaiming that Forenpohar testified that she believed all accusations of Tammy against Harmon. Instead, the prosecuting attorney should have objected to defense counsel's argument because the evidence did not corroborate counsel's statement. Two falsehoods do not create a truth.

In *State v. Jones*, 144 Wn. App. 284, 183 P.3d 307 (2008), a prosecution for a controlled substance delivery, defense counsel questioned a law enforcement officer about the failure of the confidential informant to testify. Counsel asked the officer whether a court had issued a warrant for the arrest of the informant. On redirect examination of the officer, the State's attorney asked if the confidential informant had expressed concern about testifying against Richard Jones. Over defense counsel's objection, the officer answered that the informant told the officer that the informant feared testifying and thereby implied that the informant feared that Jones would harm him.

On appeal, in *State v. Jones*, Richard Jones contended the prosecuting attorney engaged in misconduct when asking a witness to supply a hearsay statement in order to bolster the credibility of the confidential informant. The State responded that Jones opened the door. The Supreme Court sided with Jones and answered that a defendant has no power to open the door to prosecutorial misconduct.

The California Supreme Court recently wrote:

"Defense counsel does not open the door for prosecutorial vouching every time he or she argues that a prosecution witness's testimony is untrue." (*Rodriguez*, *supra*, 26 Cal. App. 5th at p. 910, 237 Cal. Rptr. 3d 550.) Impermissible vouching—where counsel relies on evidence not available to the juror or invokes his or her personal prestige or depth of experience—does not become permissible simply because the speaker claims to be responding to something opposing counsel said. *People v. Bain* (1971) 5 Cal. 3d 839, 849, 97 Cal. Rptr. 684, 489 P.2d 564 ["A prosecutor's misconduct cannot be justified on the ground that defense counsel 'started it' with similar improprieties"]; *People v. Taylor* (1961) 197 Cal. App. 2d 372, 383, 17 Cal. Rptr. 233 ["It is no answer to state that defense counsel also used questionable tactics during the trial and therefore the district attorney was entitled to retaliate"].

*People v. Rodriguez*, 9 Cal. 5th 474, 484-85, 463 P.3d 815, 822-23, 262 Cal. Rptr. 3d 618, 626 (2020) (alterations in original).

After the State's attorney told the jury that Natalie Forenpohar testified on behalf of the State because Forenpohar believed Tammy, counsel added that neither counsel plays a role in determining who told the truth. Based on this additional comment, the State contends its attorney rectified any error. But the prosecuting attorney said more:

> *Natalie fully believes everything out of* [*Tammy's*] *mouth in regard to what happened to her in what Oliver did. That's why she testified. That's what she was talking about.*
> So. *And you know what, it's not for myself or for Mr. Oakley to tell you who's lying, who's not lying, what it is*.

RP at 524 (emphasis added). Before telling the jury that he should not tell it who is or is not lying, the State's attorney did exactly that. More importantly, the prosecutor did not add that a witness should not tell the jury who is telling the truth. The prosecuting

attorney directed the jury to believe Tammy based in part on the alleged vouching by Natalie Forenpohar.

I must now decide whether the vouching constitutes prosecutorial misconduct sufficient to require a new trial. To resolve a claim of prosecutorial misconduct, we first inquire whether the prosecutor uttered improper comments, then, if the answer is yes, we inquire as to whether the comments prejudiced the defendant. *State v. Lindsay*, 180 Wn.2d 423, 431, 326 P.3d 125 (2014). I have already written that the prosecutor improperly vouched for the victim, Tammy, so I proceed to address the extent of prejudice.

Different standards for reversal of a conviction apply depending on whether the accused objected to the prosecutorial misconduct at trial. To prevail on appeal on a claim of prosecutorial misconduct when the defense objected below, a defendant must simply show prejudice. *State v. Warren*, 165 Wn.2d 17, 26, 195 P.3d 940 (2008); *State v. Yates*, 161 Wn.2d 714, 774, 168 P.3d 359 (2007), *abrogated on other grounds by State v. Gregory*, 192 Wn.2d 1, 427 P.3d 621 (2018). Oliver Harmon's attorney failed to object to the prosecutor's vouching for the veracity of Tammy falsely through Natalie Forenpohar. If defense counsel fails to object to the misconduct at trial, the defendant on appeal must show more than some prejudice. Washington courts consider the claim of prosecutorial misconduct waived on appeal unless the misconduct is so flagrant and ill-intentioned that it evinces an enduring prejudice that the trial court not have cured by a

jury instruction. *State v. Gregory*, 158 Wn.2d 759, 841, 147 P.3d 1201 (2006), *overruled on other grounds by*, *Sate v. W.R.*, 181 Wn.2d 757, 336 P.3d 1134 (2014); *State v. Evans*, 163 Wn. App. 635, 642-43, 260 P.3d 934 (2011).

The higher standard of prejudice for prosecutorial misconduct employs fuzzy adjectives and imposes on the court the task of entering the minds of jurors such that the standard is nearly impossible to apply. Part of the misconduct test requires a showing of "ill-intention" by the prosecuting attorney. "Ill-intentioned" means having malicious intentions. Dictionary.com, https://www.dictionary.com/browse/ill-intentioned (last visited Jan. 24, 2022). We enter a quagmire when attempting to discern the intentions of a prosecuting attorney.

The misconduct of the prosecutor must also be flagrant. "Flagrant" is something considered "wrong or immoral[,] conspicuously or obviously offensive." Oxford English Dictionary Online, https://en.oxforddictionaries.com/definition/flagrant (last visited Jan. 24, 2022). Characterizing a prosecuting attorney's conduct as flagrant is also problematic.

Based on Supreme Court language, the majority reasonably writes that reversible prosecutorial misconduct requires "intentional misconduct." Majority opinion at page 24. Nevertheless, despite the ill-intentioned standard, our Supreme Court has directed us not to delve into the mind of the prosecutor. The Supreme Court has written twice that we should not focus on the prosecutor's subjective intent in committing misconduct, but

11

instead on whether the defendant received a fair trial in light of the prejudice caused by the violation of existing prosecutorial standards and whether that prejudice could have been cured with a timely objection. *State v. Walker*, 182 Wn.2d 463, 478, 341 P.3d 976 (2015); *State v. Emery*, 174 Wn.2d 741, 762, 278 P.3d 653 (2012). I have already noted that the State's counsel violates prosecutorial standards when vouching for a witness.

At least two Washington courts have noted one factor to consider when determining if improper prosecutorial arguments were flagrant and ill-intentioned such that the accused suffered prejudice. An argument should be so characterized when a Washington court previously recognized those same arguments as improper in a published opinion. *State v. Johnson*, 158 Wn. App. 677, 685, 243 P.3d 936 (2010); *State v. Fleming*, 83 Wn. App. 209, 213-14, 921 P.2d 1076 (1996). In *State v. Fleming*, the prosecuting attorney told the jury that, to acquit the defendants of rape, the jury must find that the victim lied or was confused. This court held the misconduct to be flagrant because the prosecutor uttered the argument two years after an opinion proscribing the argument.

I follow *State v. Johnson* and *State v. Fleming*. As previously written, at least five Washington decisions hold that neither the prosecutor nor a witness can vouch for the truthfulness of another witness, let alone the victim. *State v. Johnson*, 152 Wn. App. 924 (2009); *State v. Sutherby*, 138 Wn. App. 609 (2007); *State v. Dunn*, 125 Wn. App. 582 (2005); *State v. Jerrels*, 83 Wn. App. 503 (1996); *State v. Alexander*, 64 Wn. App. 147

12

(1992). For this reason alone, I conclude that the prosecutorial misconduct constituted ill-intentioned and flagrant misconduct that could not be cured with a jury instruction.

The Washington Supreme Court earlier instructed lower courts to consider the likelihood of whether the misconduct affected the jury's verdict. *State v. Emery*, 174 Wn.2d 741, 761 (2012). This factor echoes the factor of whether a curative instruction can prevent harm to the accused and implicates the strength of the State's evidence. Nevertheless, the Washington Supreme Court recently has held that lower courts should not weigh the State's evidence when assessing prejudice in the context of prosecutorial misconduct. *State v. Walker*, 182 Wn.2d 463, 479 (2015). The high court, in *State v. Walker*, wrote that, even if the State has strong evidence to affirm the convictions had the defendant challenged the sufficiency of the evidence, the focus must be on the misconduct and its impact, not on the evidence that was properly admitted.

Even if I followed the old standard test of discerning reversible misconduct by measuring the vigor of the State's evidence, I would still rule that the prosecuting attorney committed ill-intentioned, flagrant, and prejudicial conduct. As numerous decisions teach, vouching by the prosecutor particularly raises concerns and renders harm in a sexual assault on a child prosecution wherein the guilt or innocence of the accused depends on the veracity of the accused and the victim. The credibility of Tammy was crucial to assessing the guilt of Oliver Harmon.

No independent witness observed any misbehavior by Oliver Harmon. One interested witness, who was purportedly nearby during some of the rapes and molestations, denied seeing any evidence suggesting criminal activity. I emphasize that Tammy testified that many of the assaults occurred in the cabs of the respective white and a purple tractor-trailer trucks. Nevertheless, a potentially disinterested witness, the owner of the trucks, insisted that he always locked the trucks and no one other than he and his wife had access to the trucks keys. Circumstances supported a finding that the trucks remained locked when the alleged crimes occurred because the trucks suffered no damage from attempted burglaries and the investigating officer found the cab of one of the trucks locked.

Based on the clashing evidence presented at trial, I doubt a curative instruction would have impacted the jury's thinking. The trial court already instructed the jury that statements by parties' counsel did not constitute evidence. When a curative instruction repeats a previously delivered instruction, the remedial instruction is less likely to cure the misconduct. *State v. Jones*, 13 Wn. App. 2d 386, 407, 463 P.3d 738 (2020).

Even though I conclude that Oliver Harmon suffered prejudice from the vouching to the honesty of Tammy and the misconduct of the State, I must still perform a harmless error analysis. *State v. Kirkman*, 159 Wn.2d 918, 927 (2007). Constitutional error is harmless only if the State establishes beyond a reasonable doubt that any reasonable jury would have reached the same result absent the error. *State v.*

*Quaale*, 182 Wn.2d at 202 (2014). The untainted evidence must be so overwhelming that it leads necessarily to a finding of guilt. *State v. Thach*, 126 Wn. App. 297, 313, 106 P.3d 782 (2005), *overruled on other grounds by State v. Case*, 13 Wn. App. 2d 657, 466 P.3d 799 (2020). Based on the same factors under which I conclude that Oliver Harmon suffered prejudice because of prosecutorial misconduct, I find, under the constitutional standard, the error to be harmful.

### Facts Not In Evidence

To repeat, the prosecuting attorney referred to evidence outside the record when claiming, contrary to the record, that grandmother Natalie Forenpohar: "fully believes everything out of [Tammy's] mouth in regard to what happened to her in what Oliver did. That's why she testified." RP at 524. In addition to Forenpohar never avowing that she believed everything that Tammy asserted with regard to Harmon, Forenpohar never disclosed the reason for why she testified. I conclude this latter comment also constituted a separate instance of prosecutorial misconduct. The prosecuting attorney implied to the jury that Natalie Forenpohar took the time and endured the trauma of subjecting herself to cross-examination because of the importance to her of telling the jury about the honesty of her granddaughter, when Forenpohar may have only testified because the State subpoenaed her.

The prosecuting attorney holds wide latitude in closing argument to draw reasonable inferences from the evidence and to express such inferences to the jury. *State*

*v. Boehning*, 127 Wn. App. 511, 519, 111 P.3d 899 (2005). Despite this latitude, however, the prosecuting attorney may not utter prejudicial statements unsupported by the record. *State v. Weber*, 159 Wn.2d 252, 276, 149 P.3d 646 (2006). The prosecutor commits misconduct when bolstering a witness' credibility based on "facts" not in evidence. *State v. Jones*, 144 Wn. App. 284, 293-294 (2008).

For the same reasons that I conclude the prosecutor's vouching constituted flagrant and prejudicial misconduct, I conclude that the State's attorney's reference to facts not in evidence comprised reversible misconduct. A prosecutor commits reversible misconduct by urging the jury to decide a case based on evidence outside the record. *State v. Pierce*, 169 Wn. App. 533, 553, 280 P.3d 1158 (2012). Earlier case law taught the prosecuting attorney that he could not argue facts outside the evidence.

Oliver Harmon does not claim cumulative error as a result of the prosecuting attorney both vouching for a witness and arguing facts not in evidence. But he runs the two arguments together for purposes of analyzing prejudice. I also do so in part because some of the same remarks that constituted vouching comprised asserting facts not in evidence. I conclude that, even if one of the prohibitions against the prosecutor's comments did not comprise error, the two prohibitions brought harmful cumulative error. Furthermore, the prosecuting attorney, during summation, uttered two comments contrary to trial testimony.

16

Cumulative error may warrant reversal, even if each error standing alone would otherwise be considered harmless. *State v. Weber*, 159 Wn.2d 252, 279 (2006); *State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). Repetitive misconduct can have a "cumulative effect." *In re Personal Restraint of Glasmann*, 175 Wn.2d 696, 707, 286 P.3d 673 (2012) (plurality opinion); *State v. Jones*, 13 Wn. App. 2d 386, 408 (2020). The test to determine whether cumulative errors require reversal of a defendant's conviction is whether the totality of circumstances substantially prejudiced the defendant and denied him a fair trial. *In re Personal Restraint of Cross*, 180 Wn.2d 664, 690, 327 P.3d 660 (2014), *abrogated on other grounds by State v. Gregory*, 192 Wn.2d 1, 427 P.3d 621 (2018).

In *State v. Jones*, 144 Wn. App. 284 (2008), this court held that the prosecutor's repeated misconduct cumulatively deprived Richard Jones of a fair trial and reversed his conviction for selling a controlled substance. Among other comments during summation, the prosecuting attorney commented that police would suffer professional repercussions if they used an untrustworthy informant and would have discontinued using an informant if they doubted his sobriety or trustworthiness. The State's counsel also suggested that the confidential informant did not testify for fear of Jones. No trial testimony supported any of the assertions. The court may not have reversed based on one instance of misconduct, but reversed because of the cumulative effect of the misconduct.

Double Jeopardy—Rape Convictions

Oliver Harmon contends that his four rape convictions violated his constitutional right to be free from double jeopardy. Because the State used identical language to charge him with multiple rapes and did not allege specific dates for each of the four acts, Harmon argues that the trial court should have instructed the jury that each of his four rape convictions must be based on distinct acts. Accordingly, he requests that we vacate three of the four rape convictions.

The State responds that the invited error doctrine bars Oliver Harmon's double jeopardy claim because he requested a jury instruction based on *11 Washington Practice: Washington Pattern Jury Instructions: Criminal* 4.25 (5th ed. 2019)(WPIC). The State also asserts that, even if Harmon did not invite this error, Harmon did not face double jeopardy because the record "manifestly" reveals that the State did not seek to impose multiple punishments for the same offense. I agree with the majority that Harmon did not invite error and proceed to the substance of Harmon's assignment of error.

In support of his double jeopardy claim, Oliver Harmon does not raise the typical argument that the State prosecuted him twice for the same crime. Instead, he contends that the jury instructions exposed him to multiple punishments for the same act. Harmon faced four counts of rape of a child. He claims that the delivered jury instructions, including jury instructions 3, 6, and 10 through 13, failed to effectively communicate to the jury that it could not convict him of more than one count for the same act of rape.

18

Although jury instruction 3 apprised the jury that it must be unanimous in finding a particular act of rape occurred, neither instruction 3 nor any other instruction informed the jury that it could not use the same act of rape to convict him of two or more counts. He contends that the failure to expressly inform the jury that each conviction must hinge on a discrete act breached double jeopardy principles.

The state and federal constitution double jeopardy clauses prohibit multiple punishments for the same offense. U.S. CONST. amends. V, XIV; WASH. CONST. art. I, § 9; *State v. Turner*, 169 Wn.2d 448, 454, 238 P.3d 461 (2010). Conversely, the double jeopardy clauses do not preclude the imposition of separate punishments for different offenses. *State v. Noltie*, 116 Wn.2d 831, 848, 809 P.2d 190 (1991).

As an initial proposition, jury instructions must adequately convey the law. *State v. Borsheim*, 140 Wn. App. 357, 366, 165 P.3d 417 (2007). The instructions must render the relevant legal standard manifestly apparent to the average juror. *State v. LeFaber*, 128 Wn.2d 896, 900, 913 P.2d 369 (1996), *abrogated on other grounds by State v. O'Hara*, 167 Wn.2d 91, 217 P.3d 756 (2009); *State v. Watkins*, 136 Wn. App. 240, 241, 148 P.3d 1112 (2006).

The manifestly apparent principle extends to the need to inform the jury that it cannot find the accused guilty of the same criminal act based on the same incident; otherwise the accused may incur multiple punishments for the same act. The defendant's exposure to double jeopardy based on inadequate instructions can occur when the State

charges multiple counts of the same crime or when two crimes overlap in elements. *State v. Peña Fuentes*, 179 Wn.2d 808, 318 P.3d 257 (2014); *State v. Sanford*, 15 Wn. App. 2d 748, 477 P.3d 72 (2020); *State v. Land*, 172 Wn. App. 593, 295 P.3d 782 (2013). In such instances, the court should deliver a separate and distinct acts jury instruction. Unfortunately, the WPICs contain no Washington Pattern Jury Instruction for separate and distinct acts, which omission may result in the absence of an instruction during some trials and many appellate decisions wherein the accused asserts a double jeopardy challenge to convictions of the same crime multiple times.

One might conclude that a juror would automatically know, without specific instructions, that, to convict the defendant of the same crime more than once, the jury must unanimously find that distinct acts occurred. The majority bases its ruling in part on this observation. Nevertheless, the law assumes otherwise. *State v. Mutch*, 171 Wn.2d 646, 254 P.3d 803 (2011) impliedly, if not expressly, directs this court to reject this notion.

In sexual abuse cases, when the State alleges multiple counts within the same charging period, the State need not elect particular acts associated with each count so long as the evidence clearly delineates specific and distinct incidents of sexual abuse during the charging period. *State v. Hayes*, 81 Wn. App. 425, 431, 914 P.2d 788 (1996). If the jury instructions do not make it "manifestly apparent" to a jury that the State does not seek multiple punishments for the same offense, the State "may" jeopardize the

defendant's right to be free from double jeopardy. *State v. Berg*, 147 Wn. App. 923, 931, 198 P.3d 529 (2008), *disapproved of by State v. Mutch*, 171 Wn.2d 646, 254 P.3d 803 (2011); *State v. Borsheim*, 140 Wn. App. 357, 367 (2007). In the absence of such an instruction, the jury might, consistent with its instructions, unanimously find that the State proved only one act beyond a reasonable doubt and yet base multiple convictions on proof of that single act. *In re Personal Restraint of Delgado*, 160 Wn. App. 898, 904, 251 P.3d 899 (2011); *State v. Berg*, 147 Wn. App. 923, 931-35 (2008).

Note that *State v. Berg* and *State v. Borsheim* employ the word "may" when referencing the accused's exposure to double jeopardy in the absence of a separate and distinct acts jury instruction. Use of the precatory auxiliary verb "may" implies that flawed jury instructions do not automatically inflict double jeopardy. If the trial court fails to instruct the jury that it must be unanimous as to which act constitutes the count charged and fails to instruct the jury that it must find "'separate and distinct acts'" for each count when the counts are identically charged, this court may still uphold the convictions if events during the trial otherwise make "'the need for a finding of 'separate and distinct acts' manifestly apparent to the average juror.'" *In re Personal Restraint of Delgado*, 160 Wn. App. 898, 904 (2011) (*quoting State v. Borsheim*, 140 Wn. App. 357, 367-68 (2007). One division of this court refers to this principle as the "manifestly apparent test." *State v. Sanford*, 15 Wn. App. 2d 748, 754 (2020).

A jury unanimity instruction does not protect against a double jeopardy violation, unless the trial court instructed the jury that it must unanimously agree that a particular act had been proven beyond a reasonable doubt for each count. *State v. Mutch*, 171 Wn.2d 646, 663 (2011); *State v. Borsheim*, 140 Wn. App. 357, 369 (2007). Oliver Harmon's jury instruction 3 informed the jury that it must unanimously find that the defendant committed a "particular act," but not a different, particular act for each count. A jury instruction to "'decide each count separately'" also does not protect against a double jeopardy violation, because the instruction fails to inform the jury that each count requires proof of a different act. *State v. Mutch*, 171 Wn.2d at 662-63 (2011).

In two Court of Appeals decisions, this court reversed and dismissed all but one of the sexual assault convictions because of the absence of a separate and distinct acts jury instruction. *State v. Borsheim*, 140 Wn. App. 357 (2007); *State v. Berg*, 147 Wn. App. 923 (2008). The remedy includes affirming one of the convictions since a jury unanimity instruction insured that the jury unanimously agreed to one instance of assault. *State v. Borsheim*, 140 Wn. App. 357, 371 (2007).

Remember that the *Borsheim* and *Berg* opinions only read that a missing separate and distinct acts instruction "may" impose double jeopardy, not that the absence of the instruction necessarily requires reversal. Nevertheless, this court, in both appeals, omitted any analysis thereafter about whether the other jury instructions, the testimony, and the argument of counsel otherwise rendered it manifestly apparent to the jury that it

needed to unanimously find separate and distinct acts in order to convict on more than

one count. The Washington Supreme Court later criticized this court for failing, in

*Borsheim* and *Berg*, to engage in an analysis of the record. *State v. Mutch*, 171 Wn.2d

646 (2011).

Flawed jury instructions that permit a jury to convict a defendant of multiple

counts based on a single act do not necessarily portend that the defendant received

multiple punishments for the same offense. *State v. Mutch*, 171 Wn.2d 646, 663 (2011).

Instead, imperfect instructions simply mean that the defendant *potentially* received

multiple punishments for the same offense. *State v. Mutch*, 171 Wn.2d 646, 663 (2011).

When reviewing allegations of double jeopardy, the reviewing court must not stop with a

reading of the jury instructions, but should review the entire record. *State v. Mutch*, 171

Wn.2d at 664; *State v. Noltie*, 116 Wn.2d 831, 848-49 (1991). No double jeopardy

violation results when the information, instructions, testimony, and argument clearly

demonstrate that the State was not seeking to impose multiple punishments for the same

offense. *State v. Mutch*, 171 Wn.2d at 664; *State v. Hayes*, 81 Wn. App. 425, 440 (1996).

Stated differently, in the absence of a separate and distinct acts instruction, the accused

suffers double jeopardy, if after considering the evidence, arguments, and instructions,

the record is not clear that it was "manifestly apparent" to the jury that the State did not

seek to impose multiple punishments for the same offense and that each count was based

on a separate act. *State v. Mutch*, 171 Wn.2d at 664 (2011); *State v. Berg*, 147 Wn. App.

923, 931 (2008).  This latter rule echoes the harmless error principle.  *State v. Mutch*, 171 Wn.2d at 664-65 (2011).

According to the Supreme Court, we must rigorously and strictly review the record.  *State v. Mutch*, 171 Wn.2d 646, 664 (2011).  Because the *Mutch* court tied the rigorous and strict review to whether the jury clearly understood its need to find separate and distinct acts, I assume the meticulous review should be geared toward protecting the accused's constitutional right against double jeopardy.  Oliver Harmon contends that the failure to deliver a separate and distinct acts instruction demands vacation of more than one convictions except in rare circumstances.  The Supreme Court wrote, in *State v. Mutch*, that Richard Mutch's "case present[ed] a rare circumstance where, despite deficient jury instructions, it is nevertheless manifestly apparent that the jury found him guilty of five separate acts of rape to support five separate convictions."  *State v. Mutch*, 171 Wn.2d at 665 (2011).  Thus, affirming all convictions in the absence of the separate and distinct acts instruction should be the exception, not the rule.

The accused, in at least ten Washington decisions, raised a double jeopardy contention similar to that raised by Oliver Harmon: *State v. Peña Fuentes*, 179 Wn.2d 808 (2014); *State v. Mutch*, 171 Wn.2d 646 (2011); *State v. Noltie*, 116 Wn.2d 831 (1991); *State v. Sanford*, 15 Wn. App. 2d 748 (2020); *State v. Sage*, 1 Wn. App. 2d 685, 407 P.3d 359 (2017); *State v. Land*, 172 Wn. App. 593 (2013); *State v. Carter*, 156 Wn. App. 561, 234 P.3d 275 (2010); *State v. Berg*, 147 Wn. App. 923 (2008); *State v.*

*Borsheim*, 140 Wn. App. 357 (2007); *State v. Ellis*, 71 Wn. App. 400, 859 P.2d 632

(1993). Because of the length of this concurring/dissenting opinion, I discuss many of

the decisions in an appendix rather than the body of the opinion.

No Washington decision provides a checklist for a court to complete when

applying the manifestly apparent test. A reading of the Washington cases, however,

suggest the following factors as considerations when applying the test when the trial

court, as in Oliver Harmon's trial, omitted a separate and distinct acts jury instruction.

The following factors, if present in a case, support rejecting double jeopardy:

- The defense did not challenge the number of incidents or claim that the

  incidents overlapped.

- The defense asserted consent.

- The victim distinguished between dates when the respective criminal acts

  occurred.

- The victim distinguished between places where the respective criminal acts

  occurred.

- The victim provided detailed descriptions of various sexual assaults or

  described events surrounding the distinct assaults.

- The trial court delivered a jury unanimity instruction.

- The trial court delivered a separate to-convict instruction for each count.

- After each to-convict instruction, the court gave a corresponding unanimity instruction requiring that "one particular act" of the charged crime must be proved for each count.

- The number of incidents, to which the victim testified, correlated to the number of to-convict instructions.

- Each to-convict instruction charged the jury that it must find that the underlying act occurred on a day other than the day on which other counts occurred.

- The to-convict instructions gave a separate date of the crime for the respective counts.

- During closing, the State elected separate acts for each count.

- The prosecuting attorney, during closing, told the jury that it must unanimously find, in order to convict on one count, the defendant committed an act distinct and separate from an act used to convict on another count.

The following factors, if present in a case, support finding double jeopardy:

- The defense provided evidence of the victim being dishonest, manipulative, or angry at the defendant.

- The victim provided inconsistent testimony.

- The victim could not distinguish one act from another or testified vaguely as to the criminal acts.

- The victim did not identify times at which the criminal acts occurred.

- The victim did not identify places where the alleged acts occurred.

- The jury instructions did not identify specific dates for the respective crimes.

- The to-convict instructions employed the same dates for the crime.

- The trial court gave only one to-convict instruction for multiple counts of the same crime.

- The prosecution, during summation, spoke of criminal acts in generalities.

I now apply the manifestly apparent test. The following factors in the trial record favor a ruling that Harmon suffered double jeopardy because the jury may have been confused. The four to-convict instructions read the same as to the window of time for the crime. Tammy testified to more alleged incidents of rape than that which the State charged. Tammy testified to at least ten sexual acts when the State charged four counts of rape and one count of communication with a minor. Tammy identified no dates on which the sexual acts occurred. Contrary to the majority's opinion, no court has identified lengthy questioning with regard to separate acts to justify an adverse double jeopardy ruling.

27

The following factors in Oliver Harmon's trial record favor a ruling that it was manifestly apparent to the jury that it must find a separate and distinct act for each conviction. The trial court gave a separate to-convict instruction for each of the four charges of rape of a child. The trial court also delivered a jury unanimity instruction and a separate counts instruction.

Tammy identified places where the acts occurred, including a bed covered in plastic inside a semi-truck, a spare room, and while playing hide-and-seek with Katrina Earhart. For at least one assault, she identified an event surrounding the incident, the event being Harmon telling her that her vagina was tight. She described one time when Harmon only inserted his glans, and she suffered pain and bled. She described an orange, magnum condom. She described differing acts, such as sexual intercourse, cunnilingus, and masturbation. Harmon did not provide any motive for Tammy fabricating.

The State's attorney explained to the jury how to analyze the multiple counts of rape. Contrary to Oliver Harmon's contention, the prosecutor tied at least two events to two counts. Counsel spoke:

> [T]he State is alleging four counts of rape of a child in the second degree and all four of those Counts are for that six month time period. So, this Jury Instruction outlines how you guys can go back and figure out okay, so [Tammy] said that there was this time that he put it in raw and it made her bleed. *Okay, that can* [*be*] *one count.*
> Okay, there's another time where [Tammy] said he—sorry, where [Tammy] said that he put his right—put his finger in me where my baby— where a baby would came [sic] out of. *That could be another count. So,*

28

> *you need to figure out if there's collectively four counts of sexual*
> *intercourse that fit that definition.*

RP at 499-500 (emphasis added). This discourse, particularly the direction to collectively decide if four counts of sexual intercourse occurred, suggests the jury must ground each count in a separate incident.

I recognize numerous conflicting factors as to whether Oliver Harmon possibly or likely suffered double jeopardy. I highlight that strong evidence from the owner of the semi-trucks, among other witnesses, contravenes the credibility of Tammy. I further underscore that Katrina Earhart testified that no sexual assaults occurred and that, even though Earhart may be an interested witness, she was frequently in the vicinity of the alleged acts and Tammy does not suggest that Earhart saw any assault. Finally, I resist the temptation to take the most traveled path and affirm the conviction in a close call. Instead, I return to the principle that this court should apply the manifestly apparent test sparingly. For these reasons, I conclude that Harmon likely suffered double jeopardy.

I respectfully concur in part and dissent in part:

_____
Fearing, J.

Appendix

In *State v. Sanford*, 15 Wn. App. 2d 748, 477 P.3d 72 (2020), the jury convicted Howard Sanford of first degree rape of a child, first degree child molestation, second degree rape of a child, and second degree child molestation. First degree child rape constitutes sexual intercourse with one under the age of twelve. One commits second degree child rape when performing sexual intercourse with a child twelve years old or above. Child molestation comprises sexual contact with a child. Conduct entailing child molestation and rape of a child can overlap when the action of the defendant in sexually touching the child eventually leads to penetration. First and second degree child molestation also maintain the same age difference as with rape.

On appeal, Howard Sanford argued that his convictions violated double jeopardy principles. This court agreed that the rape and molestation convictions imposed double jeopardy because the trial court did not instruct the jury that its verdict must be based on separate and distinct acts for each count and the State did not make it manifestly apparent that the jury had to base the convictions on separate and distinct acts. The court remanded to vacate Sanford's first degree child molestation and second degree child molestation convictions.

The State charged Howard Sanford with first degree rape of a child and first degree child molestation for incidents that occurred before the victim turned 12 years old, and second degree rape of a child and second degree molestation for incidents that occurred after the victim turned 12 years old. The victim testified that Sanford put his penis in her mouth multiple times when she was nine and also when she was 10 or 11. She also testified that this conduct occurred almost daily after she turned 12 years old. Sanford also at times licked her vagina. The abuse continued until the victim turned 14. An advanced registered nurse practitioner, who interviewed the victim testified that the victim disclosed that Sanford's penis 'was on her vagina and around her vagina lips.'" *State v. Sanford*, 15 Wn. App. 2d at 751 (2020). The victim also reported that, when she was age 10, Sanford ejaculated in her mouth.

The trial court delivered a separate counts jury instruction and a jury unanimity instruction. Nevertheless, the trial court did not instruct the jury that a finding of guilty for each offense must be based on separate and distinct acts.

During her closing argument, the prosecutor argued that the sexual intercourse supporting the child rape counts was Sanford putting his penis in the victim's mouth. The prosecuting attorney later described the child molestation events, stating: "'The

reason the defendant put his penis in her mouth was for sexual gratification.'" *State v. Sanford*, 15 Wn. App. 2d at 751 (2020). Thus, the prosecutor referred to the same conduct when seeking convictions for both rape and child molestation.

The court noted that the defendant may not be separately punished for conduct that constitutes both child molestation and child rape. The without counts are the same in fact and in law because all the elements of the rape as proved are included in molestation, and the evidence required to support the conviction for molestation also necessarily proves the rape. When the jury could convict the defendant of both child rape and child molestation based on the same acts of oral with genital contact, the trial court must instruct the jury that its verdict must be based on separate and distinct acts for each charge. The failure to give such an instruction does not necessarily mean that multiple convictions violate double jeopardy. But the failure to give a separate and distinct acts instruction in this situation creates the potential that the defendant received multiple punishments for the same offense.

Because of the possibility of a double jeopardy violation, the court, pursuant to *State v. Mutch*, reviewed the entire trial record. The only evidence presented at trial of both child rape and child molestation was that Sanford engaged in oral to genital contact involving his penis and the victim's vagina. The State presented no evidence of vaginal penetration. In turn, the State failed to identify and differentiate specific acts that could form the basis for more than one conviction. The victim's trial testimony did not differentiate between acts of rape and acts of molestation. The victim testified that Sanford put his penis in her mouth and licked her vagina multiple times for several years, all of which would constitute both rape and molestation.

In discussing rape and sexual intercourse during closing argument, the prosecutor emphasized the evidence that Sanford almost daily put his penis in the victim's mouth. She referenced the specific incident when Sanford ejaculated in the victim's mouth when she was 10, which constituted first degree child rape. The prosecutor also noted that the last time the victim remembered being forced to perform oral sex was when she was 13, which constituted second degree rape. The prosecutor stated that the incident the nurse practitioner described when Sanford's penis touched the victim's vagina constituted child molestation. In rebuttal, the prosecutor did not attempt to distinguish between rape and molestation. Instead, she referred to both offenses together as sexual abuse. In other words, the prosecutor expressly relied on the same acts to support both the rape charges and the molestation charges. The court concluded that the jury instructions, when read with the record, essentially informed the jury that the same acts that could constitute rape also could constitute molestation.

No. 37415-7-III
*State v. Harmon (concurring in part, dissenting in part)*
Appendix


In In *State v. Sage*, 1 Wn. App. 2d 685, 407 P.3d 359 (2017), a jury convicted Jonathan Sage of four counts of second degree rape of a child. Sage allegedly engaged in sexual acts with two young brothers. The State alleged two counts per child. The State alleged that both acts with the first boy occurred between September 1, 2011 and June 30, 2012, and the two acts with the second boy occurred between December 19, 2011 and December 19, 2012.

The trial court delivered separate "'to convict'" instructions for each of the four counts. After each to convict instruction, the court gave a corresponding unanimity instruction requiring that "'one particular act'" of the charged crime must be proved for each count. *State v. Sage*, 1 Wn. App.2d at 693 (2017). The court also delivered a separate crimes jury instruction, but not an instruction that each count required a separate and distinct act.

On appeal, the court relied heavily on *State v. Mutch*. The court recognized the defect in the jury instructions, but ruled that Jonathan Sage did not suffer double jeopardy because the State clearly elected separate acts for each count in closing argument, testimony supported those separate acts, and the court gave a unanimity instruction. This court emphasized that the trial court delivered a separate to-convict instruction for each count.

During testimony, one the boys detailed the various places where Sage performed intercourse with him. In closing argument, the State identified count 1 as the first time that the boy had intercourse with Sage. The State then described sex in the garage as the potential count 2. The prosecuting attorney also listed places testified to by the second child as the basis for counts 3 and 4. The second boy had also testified to events surrounding various acts and the location of the acts. These factors made it manifestly apparent to the jury that the State was not seeking multiple punishments against Sage for the same act.


In *State v. Peña Fuentes*, 179 Wn.2d 808, 318 P.3d 257 (2014), the State convicted Jorge Peña Fuentes of one count of child rape and two counts of child molestation. The trial court delivered no separate and distinct acts jury instruction. The instructions for molestation, however, required "sexual contact" and also defined sexual intercourse for purposes of rape to include "sexual contact" involving the sex organs of one person and the mouth of another. Therefore, the jury could have convicted the defendant of rape based on the same incidents that formed the basis of the molestation convictions.

During trial, the defense did not challenge the number of incidents or whether they overlapped, but rather chose the strategy of attacking the victim's credibility. In closing

the prosecutor identified two specific acts that supported the rape conviction and clearly divided the defendant's behaviors between those acts involving penetration and other inappropriate acts that constituted molestation. The Supreme Court emphasized the clarity of the State's attorney's jury summation. The high court wrote:

> It is manifestly apparent that the convictions were based on separate acts because the prosecution made a point to clearly distinguish between the acts that would constitute rape of a child and those that would constitute child molestation.

*State v. Peña Fuentes*, 179 Wn.2d at 825 (2014).

In *State v. Land*, 172 Wn. App. 593, 295 P.3d 782 (2013), the jury convicted Clifford Land of one count of child rape and one count of child molestation involving the same child and charging period. Against the State's argument, the court ruled that the manifestly apparent test applied to cases when the two convictions are for different offenses that do not have identical elements if the two offenses can arise from the same course of conduct. The victim testified that that Land inserted his finger inside her vagina on multiple occasions, touched her vaginal region without penetration, and touched her breasts. This court agreed with Land that the trial court should have given and failed to give a separate and distinct acts jury instruction. But the court concluded that it was manifestly apparent the State was not seeking to impose multiple punishments for the same offense.

The Court of Appeals highlighted that the victim did not testify that Land's mouth came in contact with her sex organs. She testified that Land touched her breasts and "lower part," both over and under her clothing, on more than one occasion. The testimony supported Land's conviction for child molestation in the third degree. The testimony did not support a conviction for rape of a child, because rape of a child requires proof of sexual intercourse. In addition, the prosecutor's argument dispelled the possibility that jurors would view the victim's vague testimony that Land kissed her on her "lower half" as proof of rape. The prosecutor highlighted the victim's testimony about penetration as the crucial element proving rape. Finally, the to-convict instructions, like the information, clearly delineated the two counts. The court reasoned that delineation distinguished Land's case from *State v. Borsheim*, wherein the to-convict instruction encompassed four identical counts in a single instruction.

33

In *State v. Mutch*, 171 Wn.2d 646, 254 P.3d 803 (2011), a jury convicted Richard Mutch of five counts of second degree rape. The jury instructions failed to include a direction that each count must be based on a separate and distinct criminal act. The "to convict" instructions for each rape count read the same, including that the State must prove the crime occurred between February 2 and 3, 1994. The court also delivered a separate counts instruction.

The Washington Supreme Court agreed with the Court of Appeals, in *State v. Borsheim*, that the separate crime instruction does not save the prosecution from double jeopardy because the instruction still fails to inform the jury that each crime required proof of a different act. The jury unanimity instruction also did not protect against a double jeopardy violation.

The Supreme Court observed that the Court of Appeals, in *State v. Berg* and *State v. Carter*, recognized the possibility of a double jeopardy breach, not the inevitability of double jeopardy when the trial court fails to deliver a separate and distinct acts instruction. Nevertheless, in both decisions, the court failed to explore beyond the jury instructions whether in fact the defendant suffered double jeopardy.

The Washington Supreme Court concluded that Richard Mutch's prosecution presented a "rare circumstance" when, despite deficient jury instructions, the court could conclude that that the jury found him guilty of five separate acts of rape to support the five separate convictions. *State v. Mutch*, 171 Wn.2d 646, 665 (2011). The high court was convinced beyond a reasonable doubt, based on the entire record, that the jury instructions did not effect a double jeopardy violation.

The victim testified to five separate episodes of rape. In turn, the trial court delivered five to-convict instructions alternatively for first and second degree rape. During its cross-examination of the victim, the defense did not challenge her account of the number of sexual acts, but rather focused on her relationship and previous interactions with Mutch. A detective testified that Mutch admitted to engaging in multiple sexual acts with the victim. The State discussed all five episodes of rape in its arguments. The defense argued consent.

In *State v. Carter*, 156 Wn. App. 561, 234 P.3d 275 (2010), *disapproved of by State v. Mutch*, 171 Wn.2d 646, 254 P.3d 803 (2011), Germaine Carter appealed his convictions for four counts of first degree child rape. Among other arguments, Carter asserted that the trial court's failure to give a separate and distinct acts jury instruction exposed him to double jeopardy. The court agreed and remanded with instructions to dismiss three of the four rape convictions.

Germaine Carter's daughter stated that, in 2003 and 2004, while she lived with her father, he entered her room at night between forty and fifty times and raped her. The daughter was then six and seven years old. The trial court instructed the jury, giving them four nearly identical "to convict" instructions, a unanimity instruction, and an instruction stating, "A separate crime is charged in each count." Neither the prosecutor nor Carter requested a jury instruction requiring that the jury find a "separate and distinct act" for each count.

The court noted that jury instructions "must make the relevant legal standard manifestly apparent to the average juror." *State v. Carter*, 156 Wn. App. at 565 (2010) (*quoting State v. Borsheim*, 140 Wn. App. 357, 366 (2007)). The State argued that, because the charging documents, evidence presented, jury instructions and closing arguments all made clear that each count required proof of a separate act, Carter was not in danger of double jeopardy. The court followed *State v. Borsheim* without reviewing the entire trial record. Although the Supreme Court, in *State v. Mutch*, disapproved of the ruling in *Carter*, the ruling might still stand, despite such disapprobation, because the child provided few details of the criminal acts.

In *State v. Berg*, 147 Wn. App. 923, 198 P.3d 529 (2008), *disapproved of by State v. Mutch*, 171 Wn.2d 646, 254 P.3d 803 (2011), the State convicted Edward Berg with two counts of child molestation of his stepdaughter. The court gave two separate, but nearly identical, to-convict instructions, a standard unanimity instruction, and a separate counts instruction. The to-convict instructions employed the same dates for the crime. This court found a double jeopardy violation because the trial court did not give a "separate and distinct act" instruction or otherwise require that the jury base each conviction of third degree child molestation on a "separate and distinct" underlying event.

The victim presented inconsistent testimony at trial. She claimed that the sexual contact happened only on the living room couch, but a friend testified that she disclosed the contact happened in her downstairs bedroom. Edward Berg claimed that the stepchild acted manipulative and unhappy at home, so she framed him by sleeping with him on the couch and by falsely accused him of raping and molesting her. The mother of the alleged victim and another occupant in the home testified that the child frequently crawled onto the couch to sleep with Berg. The mother also testified that the child often ran away from home and did not want to come home. The mother described her daughter as emotionally and physically insecure. The mother testified to the child being manipulative and a danger to the stability of the home. The mother also testified that one of the acts alleged

by the victim could not have occurred in the daughter's bedroom because fabric pieces covered the bed and the pieces remained undisturbed.

On appeal, the State argued that the jury sufficiently understood that different proof was required for each count. The State also asserted that any instructional error was harmless.

The court, while relying on In *State v. Borsheim*, agreed with Edward Berg. The court rejected arguments accepted by later courts. The State argued that Berg was adequately protected from double jeopardy because the prosecutor presented evidence of separate acts to support both convictions and explained in closing that the jury had to agree that two particular acts occurred. The court answered that the double jeopardy violation resulted from omitted language in the instructions, not the State's proof or the prosecutor's arguments. The State offered no authority for the proposition that evidence or argument presented at trial may remedy a double jeopardy violation caused by deficient instructions. The State argued that the court's unanimity instruction adequately protected Berg from double jeopardy because it contained the language, "[t]o convict the defendant on *any count* of child molestation in the third degree, one particular act of child molestation in the third degree must be proved beyond a reasonable doubt." *State v. Berg*, 147 Wn. App. 923, 934-35 (2008) (emphasis added). The court responded that the instruction did not ensure that a separate act be used to convict on all counts.

Oliver Harmon particular relies on *State v. Borsheim*, 140 Wn. App. 357 (2007). The State charged Bryan Borsheim with four counts of first degree rape of a child. As in Oliver Harmon's prosecution, the State did not, in the information or the jury instructions, identify a distinct date for each charge. Instead, the State alleged that each act occurred between September 1, 2000 and September 8, 2003. The trial court delivered a separate counts instructions, and a jury unanimity instruction similar to Oliver Harmon's jury instruction 3. The trial court also gave one to-convict instruction for all four counts.

On appeal, Bryan Borsheim argued that the jury instructions violated his right to jury unanimity and protection against double jeopardy. This court rejected his jury unanimity argument, but accepted his double jeopardy contention. The court reversed three of Bryan Borsheim's four convictions.

The court reasoned that the various jury instructions exposed Bryan Borsheim to multiple punishments for the same offense and so caused double jeopardy. The court emphasized that the one to-convict instruction referenced all four counts, a difference from Oliver Harmon's jury instructions that included a to-convict instruction for each separate count. Nevertheless, the *Borsheim* court did not consider the enfolding of all charges into one to-convict instruction essential to its ruling.

36

In *State v. Ellis*, 71 Wn. App. 400, 859 P.2d 632 (1993), which had similar separate counts and jury unanimity instructions, this court declined to find a double jeopardy violation. Each to-convict instruction charged the jury that it must find that the underlying act occurred on a day other than the day on which other counts occurred. Such language is missing from Oliver Harmon's jury instructions. Jerry Ellis' trial court added an instruction that read: "'Although twelve of you need not agree that all the acts have been proved, you must unanimously agree that at least one particular act has been proved beyond a reasonable doubt *for each count.*"' *State v. Ellis*, 71 Wn. App. at 402.

In *State v. Noltie*, 116 Wn.2d 831 (1991), the jury convicted Frederic Noltie of one count of statutory rape and one count of indecent liberties. On appeal, Noltie complained about the information, not jury instructions. Noltie criticized the information as charging him with two counts of statutory rape without sufficiently distinguishing the two alleged criminal acts. The Supreme Court rejected the argument because the information, instructions, testimony, and jury argument established that the State charged Noltie with two different instances of statutory rape and did not seek to impose multiple punishments for the same offense. The court cited the principles that, when reviewing allegations of double jeopardy, an appellate court may review the entire trial record.

The count emphasized that the trial court gave separate "'to convict'" instructions relating to the two counts of statutory rape. The instruction for the second count read, in part, that the jury must find that Noltie engaged in sexual intercourse in an incident separate from and in addition to any incident that the State may have proved in court one. During closing argument, the prosecuting attorney recognized the jury instructions provided only the "bare bones" of the elements of each count. *State v. Noltie*, 116 Wn.2d at 849 (1991). Nevertheless, the State's attorney stressed that the jury must find that Noltie engaged in sex with the child twice to convict on the second charge.